**ON REHEARING**
**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 06-2022**

_____

MARTHA WARD, on behalf of herself and all
others similarly situated,

                                    Plaintiff - Appellant,

        versus

DIXIE NATIONAL LIFE INSURANCE COMPANY;
NATIONAL FOUNDATION LIFE INSURANCE COMPANY,

                                    Defendants - Appellees,

        and

PALMETTO MARKETING ASSOCIATES, INCORPORATED;
PATTI JENKINS,

                                    Defendants.

-----------------------------

SOUTH CAROLINA DEPARTMENT OF INSURANCE;
AMERICA'S HEALTH INSURANCE PLANS,
INCORPORATED,

                                    Amici Supporting Appellees.

MARTHA WARD, on behalf of herself and all
others similarly situated,

                                    Plaintiff - Appellee,

        versus

NATIONAL FOUNDATION LIFE INSURANCE COMPANY,

                                    Defendant - Appellant,

DIXIE NATIONAL LIFE INSURANCE COMPANY,

                                    Defendant - Appellee,

        and

PALMETTO MARKETING ASSOCIATES, INCORPORATED;
PATTI JENKINS,

                                    Defendants.

----------------------------

SOUTH CAROLINA DEPARTMENT OF INSURANCE;
AMERICA'S HEALTH INSURANCE PLANS,
INCORPORATED,

                                    Amici Supporting Appellant.

Appeals from the United States District Court for the District of
South Carolina, at Columbia.  Joseph F. Anderson, Jr., Chief
District Judge.  (3:03-cv-03239-JFA)

Argued:  May 23, 2007            Decided:  October 5, 2007

            Decided on Rehearing:  November 29, 2007

Before MICHAEL and TRAXLER, Circuit Judges, and WIDENER,[1] Senior Circuit Judge.

_____

Vacated in part, affirmed in part, dismissed in part, and remanded by unpublished per curiam opinion.

_____

**ARGUED:** Richard Ara Harpootlian, Columbia, South Carolina, for Martha Ward, on behalf of herself and all others similarly situated. Elliot H. Scherker, GREENBERG & TRAURIG, L.L.P., Miami, Florida, for Dixie National Life Insurance Company and National Foundation Life Insurance Company. **ON BRIEF:** Tobias G. Ward, Jr., TODD & WARD, P.C., Columbia, South Carolina, for Martha Ward, on behalf of herself and all others similarly situated. C. Allen Foster, Kevin E. Stern, GREENBERG & TRAURIG, L.L.P., Washington, D.C.; J. Calhoun Watson, SOWELL, GRAY, STEPP & LAFFITTE, L.L.C., Columbia, South Carolina, for Dixie National Life Insurance Company and National Foundation Life Insurance Company. Jeffrey A. Jacobs, SOUTH CAROLINA DEPARTMENT OF INSURANCE, Columbia, South Carolina, for the South Carolina Department of Insurance, Amicus Curiae Supporting Dixie National Life Insurance Company and National Foundation Life Insurance Company. Joni Hong, AMERICA'S HEALTH INSURANCE PLANS, INC., Washington, D.C.; Markham R. Leventhal, Mitchell D. Sprengelmeyer, JORDEN BURT, L.L.P., Miami, Florida, for America's Health Insurance Plans, Inc., Amicus Curiae Supporting Dixie National Life Insurance Company and National Foundation Life Insurance Company.

_____

Unpublished opinions are not binding precedent in this circuit.

_____

[1]Judge Widener heard oral argument in this case but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. § 46(d).

PER CURIAM:

Plaintiff Martha Ward sued National Foundation Life Insurance Company (National) and Dixie National Life Insurance Company (Dixie), asserting that National refused to pay the full amount of benefits owed under supplemental cancer insurance policies that were issued by Dixie and later assigned to National. The district court certified a statewide (South Carolina) plaintiff class rather than the multistate class Ward sought to represent, and the court later granted summary judgment in favor of National on the breach of contract claims. Ward appealed and National cross-appealed. In a prior opinion, we concluded that although the district court properly limited the plaintiff class to South Carolina residents, the court improperly granted summary judgment on the breach of contract claims, and we remanded for further proceedings on those claims. We dismissed National's cross-appeal without prejudice. See Ward v. Dixie Nat'l Life Ins. Co., 2007 WL 2914954 (4th Cir. Oct. 5, 2007).

Ward filed a petition for rehearing, and National, supported by various amici, filed a petition for rehearing and rehearing en banc. We granted Ward's petition for panel rehearing and denied National's petition for rehearing, thus vacating our prior opinion.[2] See Fourth Circuit I.O.P. 40.2. Dispensing with

---

[2]Because no member of the court called for a vote on National's petition for rehearing en banc, the petition was denied. See Fourth Circuit Local Rule 35(b).

4

further briefing and argument, we now vacate the district court's decision granting summary judgment in favor of National, and we remand with instructions for the district court to instead enter judgment in favor of Ward on the breach of contract claims. In light of our remand, we conclude that it would be premature for us to consider the class certification issue. We therefore dismiss without prejudice National's cross-appeal.

I.

In August 1990 Ward purchased a cancer treatment benefit policy from Dixie covering both herself and her husband. Ward's policy is a type of supplemental insurance under which direct payments are made to the policyholder when an insured patient undergoes covered cancer treatments. Benefits under this kind of policy are paid regardless of whether the patient has other insurance sufficient to cover all medical expenses. When the patient has other insurance covering cancer treatments, the policyholder is able to retain the money received as a result of the supplemental coverage.

Benefits under Ward's policy vary as to the procedure performed. In some sections the policy provides clear caps as to the maximum benefit to be paid. For example, the policy provides a "Schedule of Operations" listing the maximum amount to be paid -- ranging from $150 for skin excisions to $3000 for removal of an

5

intracardiac tumor -- for a variety of operations. In many other sections of the policy no dollar amounts are provided, and benefits are calculated in relation to the "actual charges" for the covered procedures. Section (F) of the policy, titled "X-ray Therapy, Radium Therapy, Radiation Therapy, and Chemotherapy Benefit," provides an example of this language:

> We will pay the actual charges for teleradiotherapy, using either natural or artificially propagated radiation, when used for the purpose of modification or destruction of tissue invaded by cancer. We will also pay the actual charges made for plaques or molds or the administration internally, interstitially, or intracavitarially of radium or radioisotopes in sealed sources for the purpose of modification or destruction of tissue invaded by cancer. We will also pay the actual charges for cancericidal chemical substances and the administration thereof for the purpose of the modification or destruction of tissue invaded by cancer.

J.A. 221. Although the phrase is used repeatedly throughout the policy, no definition for "actual charges" is provided.

Dixie assigned Ward's policy to National in 1994. In 2001 Ward began filing claims under the policy after her husband, James Ward (James), was diagnosed with prostate cancer and started receiving treatment. Shortly thereafter, a dispute between Ward and National arose over how benefits paid in the amount of the "actual charges" are calculated.

For a number of years after the assignment, National appears to have calculated benefits in the same manner that Dixie had previously done. Specifically, when the benefit owed was based on the "actual charges," Dixie paid the benefit based on the

6

amounts billed to patients by their medical providers. Dixie paid such amounts even though providers often have agreements with certain insurers to accept as payment-in-full an amount less than that reflected on the patient's bill. In this case, for example, James's primary health insurance is provided through a plan administered by Blue Cross and Blue Shield of South Carolina (BCBS). Regardless of the amounts billed to James, his medical providers have an agreement with BCBS that requires them to accept a discounted amount as payment-in-full for services rendered to BCBS insureds. This agreement prohibits providers from attempting to collect an amount in excess of the pre-negotiated, discounted fee from BCBS insureds such as James.

Toward the end of the year in 2001, National changed its benefit payment practice. When Ward submitted claims for James's treatments in 2002, she was told that she would have to submit an explanation of benefits (EOB) statement. By viewing the EOB, National would be able to determine what the pre-negotiated discount rate was for James's treatments and calculate benefits in light of this reduced amount. Ward refused to provide National with the EOB statements because she contended that under the terms of her policy, the "actual charge" was reflected in the non-discounted bill that she received rather than in the EOB.

On March 7, 2003, after Ward was unable to resolve the dispute, she filed an action in the Court of Common Pleas for

7

Richland County, South Carolina, against both Dixie and National. The defendants removed the action to federal court on October 10, 2003. On September 15, 2004, Ward moved to certify a plaintiff class consisting of

> all persons insured under cancer policies from Defendant Dixie National Life Insurance Company where Dixie promised to pay to the insured the "actual charges" incurred for certain medical services, but instead paid not the actual charges but rather the (lesser) amount that the insured's primary health insurer negotiated with the healthcare provider to pay for the medical procedure[.]

S.A. 7. On May 5, 2005, the district court certified a class of South Carolina residents. The court limited the class to South Carolina residents based on its understanding of South Carolina's door-closing statute, S.C. Code Ann. § 15-5-150. Ward, with permission of the court, filed a third amended complaint on September 27, 2005, asserting claims for (1) breach of contract against both Dixie and National; (2) bad faith refusal to pay against National; and (3) breach of contract accompanied by a fraudulent Act against National. Ward later abandoned the bad faith claim. Cross-motions for summary judgment followed. In addition, National filed a motion, joined by Dixie, to decertify the statewide class.

On May 10, 2006, the district court granted National's motion for summary judgment while denying Ward's. The court concluded that under South Carolina contract law, the phrase "actual charges" is not ambiguous and must be read to mean "the

8

charges for which the patient is liable when medical services are rendered, not the fictional amounts indicated on the invoice that the provider does not expect the patient to pay." J.A. 1074. Because Ward did not prevail on her breach of contract claims, the joint motion to decertify the class and Dixie's motion for summary judgment were denied as moot.

Ward appeals both the grant of summary judgment to National as well as the district court's decision to limit class membership to South Carolina residents. National has filed a cross-appeal contesting the district court's decision to certify even a statewide class.

## II.

We begin with Ward's argument that the district court erred in concluding that, as used in her policy, the unambiguous meaning of the phrase "actual charges" is the discounted amount that medical providers have agreed to accept as full payment pursuant to a third-party agreement with another insurer. Under South Carolina law when a term has a "plain, ordinary, and popular meaning," courts must interpret the term to give effect to that ordinary usage. Century Indem. Co. v. Golden Hills Builders, Inc., 561 S.E.2d 355, 358 (S.C. 2002). When a term has a plain meaning and that meaning is "clear and unambiguous, the language [of the contract] alone determines the contract's force and effect."

9

<u>Schulmeyer v. State Farm Fire & Cas. Co.</u>, 579 S.E.2d 132, 134 (S.C. 2003). Of course not all terms are susceptible to plain and ordinary definition because of the simple fact that they are not popularly used. As a result, a contract term is ambiguous when it lacks a plain definition and is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." <u>Hansen v. United Servs. Auto. Ass'n</u>, 565 S.E.2d 114, 117-18 (S.C. 2002).

In the district court's endeavor to discern the plain meaning of "actual charges" as used in Ward's policy, it reasoned that the word "actual" should be given a separate meaning from the word "charges." Because the district court understood the word "actual" to mean something that is real or true, it concluded that "actual charges" means the amounts for which the patient is truly liable as opposed to "the fictional amounts indicated on the invoice that the provider does not expect the patient to pay." J.A. 1074. We disagree both with the district court's interpretive approach as well as the conclusion that it reached. The definition settled on by the district court is not the only one possible when the language of the policy is considered in light of its context. As we explain below, the meaning of the phrase "actual charges" as used in Ward's policy is ambiguous.

10

First, even under the district court's approach -- defining each word separately and then putting those definitions together -- another meaning can reasonably be found. The words "actual charges" could also be understood to mean the amount shown on the bill sent to the patient regardless of whether this amount is the same as the amount actually owed. Viewed from within the four corners of the policy, the phrase is ambiguous as there is nothing to indicate whether "actual charges" is best understood to mean the amount actually billed or the amount actually owed. See Conner v. Am. Pub. Life Ins. Co., 448 F. Supp.2d 762, 766 (N.D. Miss. 2006) (finding "inherent ambiguity in the undefined term 'actual charges'"); Metzger v. Am. Fid. Assur. Co., No. CIV-05-1387-M, 2006 U.S. Dist. LEXIS 70061, at *13 (W.D. Okla. Sept. 26, 2006) (same).

Second, we disagree with the assertion that the district court was correct "in considering ordinary dictionary definitions" of both "actual" and "charges." Appellees' Br. at 21. We conclude that a person "who is cognizant of the customs, practices, usages and terminology as generally understood" in the health insurance industry would regard "actual charges" as a term of art rather than two words to be separately defined. Hansen, 565 S.E.2d at 117. The words are used throughout the insurance policy together as a phrase -- a phrase that neither appears in a standard dictionary nor has an ordinary, popular usage. Contrary to the defendants'

11

contention, South Carolina's principles of contract interpretation in no way prohibit courts from reading a phrase as a term of art if that is how it would be regarded by an objective observer well-versed in medical insurance terminology. See Frazier v. Badger, 603 S.E.2d 587, 591 (S.C. 2004).

Third, even when viewed as a term of art, the phrase remains ambiguous. Prior to filing this lawsuit, Ward wrote to the South Carolina Department of Insurance and asked to be provided with a legal definition of "actual charge." A representative of the Department wrote back explaining that "[t]he term 'actual charge' in industry-wide standards is the amount that you are legally obligated to pay for a specific service." J.A. 611 (emphasis in original). In contrast to the view taken by the Department of Insurance, numerous health care dictionaries define "actual charge" as the amount billed. See, e.g., Mosby's Medical, Nursing, and Allied Health Dictionary 26 (4th ed. 1994) ("actual charge, the amount actually charged or billed by a medical practitioner for a service. The actual charge may not be the same as that paid for the service by an insurance plan."); Lee Hyde, The McGraw-Hill Essential Dictionary of Health Care 133 (1988) ("actual charge. the amount a physician or other practitioner actually bills a patient or his insurance for a medical service or procedure.") (emphasis in original). Because the policy itself does not

12

indicate which definition was intended by the parties, we conclude that its meaning is ambiguous.[3]

We must now determine what remedy flows from our conclusion that the insurance policy is ambiguous. In a typical contract dispute, the meaning of an ambiguous contract is a question of fact to be resolved by the jury. See, e.g., Café Assocs., Ltd. v. Gerngross, 406 S.E.2d 162, 164 (S.C. 1991) ("As a general rule, written contracts are to be construed by the Court; but where a contract is ambiguous or capable of more than one construction, the question of what the parties intended becomes one of fact, and the question should be submitted to the jury."). Although statements of that general rule appear in cases involving insurance disputes, see Waters v. S. Farm Bureau Life Ins. Co., 617 S.E.2d 385, 388 (S.C. Ct. App. 2005), only latent ambiguities in an insurance policy are resolved by a jury; patent ambiguities must be resolved in favor of the insured. See Cogdill v. Equity Life & Annuity Co., 203 S.E.2d 674, 677 (S.C. 1974); Hann v. Carolina Cas. Ins. Co., 167 S.E.2d 420, 423 (S.C. 1969). Accordingly, if the

---

[3]National and its supporting amici contend that, absent compelling reasons, we must defer to the Department of Insurance's interpretation of "actual charges." We disagree. Although an agency's interpretation of a statute it is charged with enforcing is entitled to deference, see Dunton v. S.C. Bd. of Examiners in Optometry, 353 S.E.2d 132, 133 (S.C. 1987), the Department of Insurance has no statutory mandate to pronounce the meaning of a term in an individual insurance policy. We are of course interested in the Department's position, but South Carolina law does not in this case require us to defer to the Department's view of the matter.

13

ambiguity in this case is patent, the district court should have granted summary judgment in favor of Ward on the breach of contract claims. If the ambiguity is latent, the meaning of the policy must be determined by a jury on remand.

A patent ambiguity is one where the uncertainty as to meaning "arises upon the words of the will, deed, or other instrument as looked at in themselves, and before any attempt is made to apply them to the object which they describe." Hann, 167 S.E.2d at 422 (quoting Jennings v. Talbert, 58 S.E. 420, 421 (S.C. 1907)); cf. Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co., 165 F.3d 1157, 1162 (7th Cir. 1999) ("A patent ambiguity in a contract is one that is apparent from just reading the contract."). With a latent ambiguity, "the uncertainty arises, not upon the words of the will, deed, or other instrument as looked at in themselves, but upon those words when applied to the object or subject which they describe." Hann, 167 S.E.2d at 422. A latent ambiguity thus "does not appear on the face of the words used, nor is its existence known until those words are brought into contact with collateral facts." Hastings v. Union Fire Ins. Co., 125 S.E. 923, 924 (S.C. 1924) (internal quotation marks omitted); cf. Stone Container Corp., 165 F.3d at 1162 ("A latent ambiguity arises when, although the contract is clear 'on its face,' anyone knowing the background would know that it didn't mean what it seems to mean.").

14

We believe that the phrase "actual charges" is patently ambiguous. The phrase is susceptible of more than one reasonable interpretation, and the uncertainty of meaning arises thus from the phrase itself, not from the application of the phrase to collateral facts. See Cogdill, 203 S.E.2d at 677 (concluding that "lame back" as used in a policy provision limiting disability benefits could plausibly be construed in more than one way and that the phrase was patently ambiguous); Hastings, 125 S.E. at 924 (finding latent ambiguity in fire insurance policy that covered two barns because the insured's property included two traditional barns and an abandoned tenant house used by the insured as a barn).

Because the ambiguity is patent, construction of the policy is for the court rather than a jury. See Cogdill, 203 S.E.2d at 677; Hann, 167 S.E.2d at 423. South Carolina law very clearly requires us to resolve the ambiguity in favor of the insured. See Helena Chem. Co. v. Allianz Underwriters Ins. Co., 594 S.E.2d 455, 459 (S.C. 2004) ("Where the words of an insurance policy are capable of two reasonable interpretations, the construction most favorable to the insured should be adopted."); Hann, 167 S.E.2d at 423 ("It is settled beyond cavil in this jurisdiction that the terms of an insurance policy should be construed most liberally in favor of the insured, and that in case of conflict or ambiguity, a construction will not be adopted that defeats recovery if the policy is reasonably susceptible of a

15

meaning that will permit recovery. We uniformly give the insured the benefit of any doubt in the construction of the terms used in an insurance policy."). Accordingly, we vacate the district court's grant of summary judgment to National and remand with instructions that the district court enter summary judgment in favor of Ward on her breach of contract claims.

III.

A.

We now turn to the question of whether the district court properly limited the class of plaintiffs to those who, like Ward, are residents of South Carolina. In her motion for class certification, Ward made clear that she sought to represent persons residing throughout the southern United States who had bought policies from Dixie that were later assigned to National. Because the proposed class included non-residents of South Carolina, the district court requested briefing from the parties on the effect of South Carolina's door closing statute, S.C. Code Ann. § 15-5-150, on the potential out-of-state class members. That statute provides:

> An action against a corporation created by or under the laws of any other state government or country may be brought in the circuit court:

16

(1) By any resident of this State for any cause of action; or

(2) By a plaintiff not a resident of this State when the cause of action shall have arisen or the subject of the action shall be situated within this state.

S.C. Code Ann. § 15-5-150. As recently reinterpreted by the Supreme Court of South Carolina in Farmer v. Monsanto Corp., 579 S.E.2d 325 (S.C. 2003), § 15-5-150 determines the capacity of a party to sue. Furthermore, Farmer held that "§ 15-5-150 controls the eligibility of class members in a class action where the defendant is a foreign corporation." 579 S.E.2d at 559. For suits in South Carolina state court, the effect of Farmer is to limit class membership to those persons who would have had capacity to sue for themselves.

In ruling on Ward's motion for class certification, the district court concluded that § 15-5-150 prevented Ward from representing out-of-state plaintiffs. The district court reached this conclusion by relying on our prior decisions stating that "a South Carolina federal court exercising diversity jurisdiction must apply § 15-5-150 'unless there are affirmative countervailing federal considerations.'" Proctor & Schwartz, Inc. v. Rollins, 634 F.2d 738, 739-40 (4th Cir. 1980) (quoting Szantay v. Beech Aircraft Corporation, 349 F.2d 60, 64 (4th Cir. 1965)). Our decisions in Proctor & Schwartz and Szantay, however, interpreted the door-closing statute in light of the then-prevailing

17

understanding that § 15-5-150 restricted not capacity to sue but the subject matter jurisdiction of state courts. In Farmer the Supreme Court of South Carolina overruled its prior cases stating that § 15-5-150 dealt with jurisdiction.

In this case, we do not find it necessary to decide what effect the reinterpreted door-closing statute has on class membership in suits being heard in South Carolina federal courts sitting in diversity. This is so because, as we discuss next, Ward has failed to establish that the proposed multistate class meets Rule 23(b)(3)'s requirement that common legal issues predominate.

B.

Fed. R. Civ. P. 23 sets the requirements for class certification. First, Rule 23(a) provides that certification is proper only if

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Once Rule 23(a)'s requirements of numerosity, commonality, typicality, and representational adequacy are met, the proposed class must still satisfy one of three additional requirements for certification under Rule 23(b).

18

Because Ward sought class certification under Rule 23(b)(3), she was required to show that

> questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). The predominance requirement under Rule 23(b)(3) "is similar to but 'more stringent' than the commonality requirement of Rule 23(a)." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006) (quoting Lienhart v. Dryvit Sys., 255 F.3d 138, 146 n. 4 (4th Cir. 2001)). The party seeking class certification bears the burden of establishing all Rule 23 requirements. In re A.H. Robins Co., 880 F.2d 709, 728 (4th Cir. 1989).

In her class certification memorandum, Ward stated that "members of the Class are dispersed throughout the southern United States." S.A. 12. She further noted that "Dixie marketed and sold cancer policies in at least seven states other than South Carolina, including Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, and Texas." Id. Although Ward's multistate class purported to include "at a minimum, thousands of persons" across the southern United States, Ward never identified what state law would apply to the claims of absent class members who are not residents of South Carolina and whose claims have no

19

connection to that state. Id. In a class action potentially governed by the laws of multiple states, identifying the applicable body or bodies of state law is critical because "variations in state law may swamp any common issues and defeat predominance." Castano v. American Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996). Ward has the burden of showing "that common questions of law predominate, and [she] cannot meet this burden when the various laws have not been identified and compared." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 370 (4th Cir. 2004); see also Cole v. GMC, 484 F.3d 717, 730 (5th Cir. 2007) (decertifying a class because "[p]laintiffs have failed to adequately address, much less extensively analyze, [] variations in state law") (internal quotation marks and citation omitted).

Because the district court ruled on the effect of the door-closing statute before addressing the merits of Ward's motion for class certification, it did not decide whether the proposed multistate class meets the requirements of both Rule 23(a) and Rule 23(b)(3). Even assuming that this proposed class could satisfy the requirements of Rule 23(a), Ward has not established that the multistate class satisfies Rule 23(b)(3)'s requirement that common questions of law predominate. Specifically, Ward failed to identify and compare the applicable state laws. When a plaintiff seeking certification fails to provide this analysis, it is not possible for the district court to determine whether any

variations in state law "pose 'insuperable obstacles' to certification" of a multistate class. Spence v. Glock, GES.m.b.H., 227 F.3d 308, 313 (D.C. Cir. 2000) (quoting Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986)). The need in this case to identify all governing state laws and compare any variations is underscored by the decisions in two recent cases where plaintiffs in states within the proposed geographic class made claims materially similar to Ward's. In contrast to our decision today under South Carolina law, two district courts applying contract law principles of Alabama and Louisiana concluded that the meaning of "actual charges" is unambiguous as a matter of law. See Claybrook v. Cent. United Life Ins. Co., 387 F. Supp.2d 1199, 1203 (M.D. Ala. 2005); Jarreau v. Cent. United Life Ins. Co., No. 05-83-FJP-SCR, 2006 U.S. Dist. LEXIS 51196 at *2 (M.D. La. May 16, 2006). In light of Ward's failure to show that common issues of law would be predominant in a multistate class, we affirm the decision of the district court to limit class membership to South Carolina residents regardless of the effect of the door-closing statute. See United States v. Smith, 395 F.3d 516, 519 (4th Cir. 2005) ("We are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record.").

We now turn to the cross-appeal filed by National, one of the defendants. National claims that the district court abused its discretion in certifying even a statewide class because: (1) the class is not sufficiently numerous; (2) Ward is neither a typical nor adequate class representative; and (3) individual issues will predominate the determination of class members' claims. On May 19, 2005, after the statewide class had been certified but before any party had filed a motion for summary judgment, National and Dixie petitioned this court to review the district court's certification order pursuant to Fed. R. Civ. P. 23(f). This rule grants us the discretion to entertain appeals from class certification orders prior to the entry of a final judgment. See Lienhart, 255 F.3d at 145. Our court applies a five-factor test to guide our discretion in deciding whether to hear such interlocutory appeals:

> (1) whether the certification ruling is likely dispositive of the litigation; (2) whether the district court's certification decision contains a substantial weakness; (3) whether the appeal will permit the resolution of an unsettled legal question of general importance; (4) the nature and status of the litigation before the district court (such as the presence of outstanding dispositive motions and the status of discovery); and (5) the likelihood that future events will make appellate review more or less appropriate.

Id. In their Rule 23(f) petition, the defendants raised the same objections to the class certification order that National now

asserts in this appeal. We denied the interlocutory petition for review on June 23, 2005.

National's cross-appeal of the class certification is before us as a result of the appeal taken by the plaintiff, Ward, from a final judgment, namely, the summary judgment awarded to defendant National. Because we have decided to vacate that judgment and remand the case for further proceedings, National's current challenge to class certification is procedurally akin to the earlier interlocutory appeal. This circumstance leads us to conclude that it would be premature for us to address the class certification issue. Earlier, when the district court certified the statewide class, it explicitly reserved its authority to decertify or modify the class at a future date. See McNamara v. Felderhof, 410 F.3d 277, 281 (5th Cir. 2005) (noting that under Rule 23(c)(1)(C) the district court on remand "is free to reconsider its class certification order as often as necessary before judgment."). The defendants went on to file motions for summary judgment and for decertification of the statewide class. After the district court granted summary judgment to National, the pending motion to decertify was denied as moot. Now, in light of the remand, the district court will be able to consider the motion to decertify. Accordingly, we dismiss without prejudice the cross-appeal filed by National. Cf. Baskin v. Hawley, 810 F.2d 370, 371 (2d Cir. 1987) ("Prudential considerations lead to our

23

conclusion that these appeals should be dismissed as premature notwithstanding the fact that they are taken from what was, at that time, a 'final decision[]' within the meaning of 28 U.S.C. § 1291.") (alteration in original).

V.

In sum, we conclude that the meaning of the phrase "actual charges" as used in Ward's policy is patently ambiguous. We therefore vacate the district court's grant of summary judgment to National and remand with instructions for the district court to grant summary judgment to Ward on the breach of contract claims. We affirm, albeit on alternate grounds, the district court's decision to limit class membership to South Carolina residents. Finally, we dismiss without prejudice the cross-appeal filed by National challenging the district court's certification of a statewide class.

VACATED IN PART,
AFFIRMED IN PART,
DISMISSED IN PART,
AND REMANDED