RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NORTH AMERICAN SPECIALTY INSURANCE
COMPANY,

                    *Plaintiff-Appellee*,

       *v.*

JOHN PAUL PUCEK, DAVID FOGG, BRETT
SETZER, and ROBERT L. EDWARDS,

                    *Defendants-Appellants*.

No. 12-5734

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:08-cv-00486—Joseph M. Hood, District Judge.

Decided and Filed:  March 11, 2013[*]

Before:  KEITH, MARTIN, and COLE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Scott A. Crosbie, William C. Hurt, Jr., Aaron D. Reedy, HURT, CROSBIE & MAY, PLLC, Lexington, Kentucky, for Appellants.  M. Jane Brannon, JACKSON KELLY, PLLC, Lexington, Kentucky, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge.  This case involves a dispute over an equine mortality insurance policy.  John Paul Pucek, David Fogg, Brett Setzer, and Robert L. Edwards, the former owners of a horse named Off Duty, appeal a district court order granting summary judgment to North American Specialty Insurance, Co.  For the reasons set forth below, we affirm the district court's judgment.

_____

[*]This decision was originally issued as an "unpublished decision" on March 11, 2013.  The court has now designated the opinion as one recommended for full-text publication.

## I. BACKGROUND

On October 19, 2008, Off Duty, a five-year-old thoroughbred, fractured both of his sesamoid bones in his left front limb while training at Churchill Downs. A track trainer examined Off Duty and found he had a collapsed fetlock joint and thus had destroyed his suspensory apparatus. Such an injury is incurable and there are two options in response to it: (1) euthanize the horse, or (2) perform a surgical procedure called fetlock arthrodesis. The trainer at Churchill Downs told the Owners the horse could be euthanized at the track, but the Owners instead took Off Duty to another veterinarian for a second opinion. At approximately 10 a.m. on the day of the injury the Owners' insurance agent alerted Kirk Horse Insurance, LLC, the Managing Underwriter for North American Specialty, of Off Duty's injury.

The Owners took Off Duty to Rood & Riddle Veterinarian Hospital in Lexington, Kentucky, where Lawrence Bramlage, D.V.M., examined Off Duty on October 19. That afternoon Dr. Bramlage told Ron Kirk and Ryan Quinn of Kirk Horse Insurance about Off Duty's condition. Dr. Bramlage told Kirk and Quinn that, while a horse's suspensory apparatus cannot be reconstructed, he believed Off Duty was a good candidate for fetlock arthrodesis and that there was a fifty-percent chance that Off Duty could be saved as a breeding stallion. Fetlock arthrodesis is a procedure where the horse's joint is fused, allowing the horse to stand on its leg. Without surgery, the horse will likely die from a condition called "laminitis," caused by the horse placing too much weight on the leg opposite the injured limb. Laminitis is extremely painful and horses with laminitis are euthanized. Dr. Bramlage had helped pioneer the fetlock arthrodesis surgery, which is considered a salvage surgery as, in the Appellant's words, "the horse can be kept alive and his economic value salvaged."

While Dr. Bramlage believed Off Duty was a good candidate for the fetlock surgery, he refused to provide an official opinion to North American Specialty on the case because the Owners had hired him to inspect Off Duty. Furthermore, the Owners had told Dr. Bramlage they wanted to euthanize the horse and did not want to proceed with the surgery. On October 20, Dr. Bramlage sent a letter to one of the Owners, John

Pucek, with a copy to Quinn, saying that Off Duty's fetlock injury was grounds for humane destruction under the American Association of Equine Practitioners' guidelines. The letter also stated that the fetlock surgery "is a long and complicated surgical procedure and the [American Association of Equine Practitioners] Insurance Committee has held that it is beyond what should be required of the insured, unless all parties agree to proceed with the attempt to save the horse." Bramlage's letter says that North American Specialty requested he consider surgery, but he would not agree unless the Owners were also in agreement. Bramlage recommended North American Specialty seek another veterinary opinion, and he referred Quinn and Kirk to Dr. Michael Spirito or Dr. Robert Hunt for a second opinion.

Quinn contacted Dr. Spirito on October 21. Dr. Spirito ultimately recused himself from the proceedings because he was friends with Kirk and also with David Fogg, one of the Owners, who had contacted Spirito asking that he provide an opinion in support of euthanasia. However, Dr. Spirito did provide the Owners with an unofficial opinion, saying the injury was incurable and met the American Association of Equine Practitioners guidelines for euthanasia. Spirito also agreed that the fetlock arthrodesis surgery, if successful, would save Off Duty's life.

After Dr. Spirito's recusal, Kirk called the second veterinarian Dr. Bramlage recommended, Dr. Hunt, on October 22. Also on October 22, Kirk received a letter from the Owners' counsel stating that they had decided to euthanize Off Duty within twenty-four hours. Because Dr. Hunt was not available that evening, Dr. Hunt's partner, Dr. Richard Holder, personally examined Off Duty at the Rood & Riddle facility on Hunt's behalf and provided Dr. Hunt with a summary of Off Duty's condition. Dr. Holder described Off Duty as being calm, with normal heart and breathing rates. Dr. Holder said Off Duty was eating well, did not appear stressed, and was "passing manure normally."

The next day, October 23, the Owners' counsel contacted Kirk at 1:30 p.m. saying it was their intention to euthanize Off Duty. Pucek had visited Off Duty and felt the horse was suffering and had video-taped Off Duty in his stall. At 2:35 p.m., the Owners received Dr. Hunt's opinion which stated that while Off Duty's injury was life-

threatening if not addressed, he believed Off Duty was a good candidate for fetlock arthrodesis surgery. Dr. Hunt recommended the fetlock surgery; however, he agreed that if there were any complications from the surgery he would recommend humane destruction. Given Pucek's opinion of Off Duty's condition, Dr. Hunt asked another of his partners, Dr. Smith, to examine Off Duty at 2:50 p.m. on October 23, to make sure Off Duty's condition had not changed from the day before. Dr. Smith found Off Duty's heart and breathing rates to be within normal range. This is consistent with Rood & Riddle's medical records as well, which record Off Duty as "[a]mbulating well around the stall" on October 23.

Later on the afternoon of October 23, North American Specialty offered to pay for the fetlock surgery and post-operative care of Off Duty until he had recovered, without diminishing the policy's coverage. The Owners rejected the offer and euthanized Off Duty the next morning on October 24, 2008.

On November 6, 2008 the Owners submitted a payment claim under their insurance policy. North American Specialty denied the claim on November 24, 2008. North American Specialty brought a declaratory judgment action and following discovery, moved for summary judgment. The district court entered summary judgment against the Owners on June 15, 2012 and the Owners now appeal.

## II. ANALYSIS

### A. Standard of Review

We review a grant of summary judgment de novo. *State Farm Fire & Cas. Co. v. Zurich Ins. Co.*, 111 F.3d 42, 44 (6th Cir. 1997). The Court must consider the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. A grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence shows "that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### B.  Interpretation of the Equine Mortality Policy

This case is a dispute over the terms of an insurance policy. This is a diversity case and we apply the choice of law provisions of the forum state, Kentucky. *Pedicini v. Life Ins. Co. of Alabama,* 682 F.3d 522, 526 (6th Cir. 2012), *reh'g denied* (July 11, 2012). In Kentucky, the legal effect of an insurance policy is a matter of law for the court. *State Farm Mut. Auto. Ins. Co. v. Slusher*, 325 S.W.3d 318, 322 (Ky. 2010) (citing *Morganfield Nat'l Bank v. Damien Elder & Sons,* 836 S.W.2d 893, 895 (Ky. 1992)). "[A]mbiguous language must be liberally construed so as to resolve all doubts in favor of the insured," and where language is not ambiguous the court should apply the ordinary meaning of the insurer's words. *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 638 (Ky. 2007); *Slusher*, 325 S.W.3d at 322.

The parties spend much of their briefs arguing about whether the Owners violated Section IV.1.u. of the policy, which outlines the Owners' obligations if the horse is injured, sick, or diseased. The relevant section requires the Owners to:

(1)  Give immediate notice to [North American Specialty's] Managing Underwriter as shown on the Declarations Page;

(2)  Employ at [the Owners'] expense a veterinarian to treat the horse;

(3)  Secure proper care, and, if necessary, allow the horse to be removed at [North American Specialty's] direction for treatment at [the Owners'] expense.

Failure or refusal to follow these steps gives North American Specialty the right to deny coverage. The Owners argue that fetlock arthrodesis surgery is beyond what "proper care" requires, while North American Specialty argues that euthanasia does not constitute treatment under the policy. The district court found it unnecessary to delve into the ambiguities of the language, holding that the Owners had violated an exclusion in the mortality policy. We agree.

North American Specialty's policy provides an exclusion from coverage if the Owners intentionally destroy the horse. However an exception to the exclusion allows

coverage for humane destruction of a horse.  *Id.*  The policy defines humane destruction as,

> the intentional slaughter of a horse:
> a.  when the horse suffers an injury or is afflicted with an excessively painful disease and a veterinarian appointed by [North American Specialty's] Managing Underwriter certifies in writing that the horse is incurable and in constant pain, or presents a hazard to itself or its handlers; or
> b.  when the horse suffers an injury and [the owners'] appointed veterinarian certifies in writing that the horse is incurable and in extreme pain, and that immediate destruction is imperative for these reasons without waiting for the appointment of a veterinarian by [North American Specialty's] Managing Underwriter.

The Owners' euthanizing of Off Duty does not meet the humane destruction standards.

For the humane destruction exception to the exclusion to apply under either clause a or b, a veterinarian must have provided two things: (1) a certified written opinion; and (2) an opinion determining that the horse was "incurable and in constant pain," or "incurable and in extreme pain."  The only certified written opinion we have here is from Dr. Hunt, and it does not meet the second requirement.  Dr. Hunt's partners did not find Off Duty to be in constant pain and Dr. Hunt's opinion determined that Off Duty was "reasonably comfortable" with normal "vital parameters."

The Owners' challenge Dr. Hunt's opinion because he did not personally examine Off Duty and they further argue that Pucek recorded a video of Off Duty on October 23, 2008 showing that the horse was in extreme pain.  The Owners' arguments are not persuasive.  While Dr. Hunt did not personally examine Off Duty, he had two qualified veterinarians check the horse for signs of distress.  Furthermore, while not certified opinions capable of meeting the policy requirements for humane destruction, neither Dr. Bramlage, nor the medical records from Rood & Riddle Veterinarian Hospital, describe the horse as being in constant or extreme pain.  Finally, the Owners' video is ultimately not relevant to the policy guidelines, which required a veterinarian to certify in writing that the horse was incurable and in constant pain.

Regardless of whether the American Association of Equine Practitioners' guidelines allow for euthanasia, the parties had agreed to the language of the contract. The Owners do not meet the exception to the Intentional Destruction exclusion.  The

Owners euthanized Off Duty, despite North American Specialty's offer to take over treatment of the horse and in violation of their Equine Mortality Policy.

## III.  CONCLUSION

For all of the reasons set forth above, we affirm the judgment of the district court.